UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DELORES MCGEE, doing business as Emergent Preparatory Academy**,<br><br>Plaintiff,<br><br>v.<br><br>**WARD MEMORIAL AFRICAN METHODIST EPISCOPAL CHURCH,**<br><br>and<br><br>**ERIE INDEMNITY COMPANY**,<br><br>Defendants. | Case No. 1:17-cv-02614 (TNM) |

## MEMORANDUM OPINION

This case arises from a flood caused by a ruptured sewer line, which made premises owned by Ward Memorial African Methodist Episcopal Church unusable for Delores McGee and the child development facility she operated. Ms. McGee seeks damages from the Church and Erie Indemnity Company on various legal theories. But the lease between the Church and Ms. McGee waives "all claims" to the maximum extent permitted by law, and Ms. McGee's non-contract claim for gross negligence is insufficient. Ms. McGee also improperly names Erie Indemnity Company as a defendant. Erie Indemnity is not the insurer under Ms. McGee's insurance contract but the insurer's attorney-in-fact. The Court will therefore grant the Church's Motion for Summary Judgment, Erie Indemnity's Motion to Dismiss, and Ms. McGee's Motion to Dismiss the Church's counterclaims based on the same suit-waiving lease.

**I.**

In June 2012, Ward Memorial African Methodist Episcopal Church leased a building in the northeast quadrant of the District of Columbia to Ms. McGee, who was doing business as

1

Emergent Preparatory Academy II.  Second Am. Compl. (Am. Compl.) ¶ 9; Lease Agreement, ECF No. 30-3 at 4 (Lease).  The Academy was a school for infants and children ages two to twelve.  Am. Compl. ¶ 9.  The lease was for five years and was governed by District of Columbia law.  *Id*. ¶¶ 9, 12.  Ms. McGee paid a $4,500 security deposit and made rent payments of $4,000 per month thereafter.  *Id*. ¶ 11.

With about a month remaining on the lease in May 2017, tree roots ruptured a sewer line, leading to sewage causing severe damage to the building's walls and floors.  *Id*. ¶¶ 13, 15.  Ms. McGee immediately notified the Church.  *Id.* ¶ 13.  The Office of the State Superintendent of Education issued an abatement order the next day that required the Academy to cease operations immediately.  *Id.* ¶ 17.  The abatement order remained in effect until "specified remediation services were performed, including air quality services."  *Id*.  But if the remediation did not start within two days, Ms. McGee would have to surrender her operating license.  *Id*.  A remediation services company told Ms. McGee that the affected walls and floor would need to be replaced.  *Id.* ¶ 15.

Ms. McGee claims that the Church had "prior, actual knowledge of the sewer line's dangerous condition because of numerous other sewage backups," one of which required "installation of a sewer cleanout line for regular maintenance."  *Id.* ¶ 16.  That cleanout line, she says, was not "properly maintain[ed]."  *Id*.

Ms. McGee maintained an insurance policy, covering January 2017 to January 2018.  *Id.* ¶ 34.  She alleges that the "only parties to the Policy are [Ms.] McGee and [Erie] Indemnity."  *Id.* ¶ 33.  The Policy states that Erie Indemnity Company serves as the attorney-in-fact for Erie Insurance Exchange and its subscribers, and that the Exchange is one of two "Member Companies" within the Erie Insurance Group—the other being Erie Insurance Property and

Casualty Company. ECF No. 31-2 at 11-12 (page numbers created by the Court's Case Management/Electronic Case Filing System (CM/ECF)).

After the flood, Ms. McGee says that Erie Indemnity would not authorize insurance payments for the state-required mediation, although it paid the remediation company to remove damaged items. *Id.* ¶¶ 18-19. Ms. McGee paid a plumber to fix the sewer line. *Id.* Ms. McGee also claims that Erie Indemnity promised to replace her personal property but has since refused to pay for her damages under her insurance policy. *Id.* ¶ 19. With no insurance payments forthcoming, Ms. McGee and the Church disagreed about who should pay for remediation; each claimed that the other was responsible. *Id.* ¶¶ 20-21. The Lease obligated the Church as landlord to "restore the damage to the Premises" after a "fire or other casualty." *Id.* ¶ 20. Ms. McGee claims that this obligation applied to the sewage damage and that the Church never intended to comply, even on the day the contract was signed. *Id.* ¶ 21.

In any event, the remediation services were not performed, and Ms. McGee lost her operating license for the Academy on May 19, 2017. *Id.* ¶ 22. Two days later, she repudiated the Lease. *Id.* In September 2017, Ms. McGee wrote a letter demanding "a pro-rated refund of the rent paid for May 2017, and her full $4,500 security deposit," which the Church ignored. *Id.* ¶ 28. With her business shut down, Ms. McGee incurred severe losses, including over $300,000 in business losses, and monthly storage costs of $1,316. *Id.* ¶¶ 30-31. Ms. McGee eventually received insurance payments of $44,000 for personal property damage and $50,000 for business losses. *Id.* ¶ 35. She alleges that her damages exceed these levels and that Erie Indemnity violated the insurance policy terms by refusing to compensate her for the full effect of the flood. *Id.* ¶¶ 36-40.

The operative complaint makes claims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing, against both the Church and Erie Indemnity. *Id.* ¶¶ 42-62. Against the Church only, Ms. McGee also brings claims for gross negligence and conversion. *Id.* ¶¶ 63-71. In response, the Church filed a counter-claim for $75,000, claiming that Ms. McGee violated the lease by underpaying her rent, not paying required utility bills, and failing to repair the premises. Counterclaim, ECF No. 16-1. The Church has also moved for summary judgment, claiming that the lease contains a full waiver of "all claims" between the parties and that Ms. McGee's non-contract claims fail on their own terms. For its part, Erie Indemnity moves to dismiss, arguing that Ms. McGee has named the wrong insurance entity.[1]

## II.

### A.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once this showing has occurred, the

---

[1] The parties have also filed other motions of note. Ms. McGee moved to dismiss the Church's counterclaims on waiver grounds, ECF No. 20, which the Court denied at an oral hearing. Minute Entry of June 21, 2018. Ms. McGee also originally named Erie Insurance Company as a defendant, ECF No. 1, but later substituted Erie Indemnity in her Second Amended Complaint. ECF No. 28. Erie Insurance Company filed a Motion to Dismiss that the Court denied, Minute Entry of June 21, 2018, before Ms. McGee's latest complaint unilaterally removed them from the case.

non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.[2]

The basis for most of the Church's Motion for Summary Judgment is a waiver contained in the lease. Mot. Summ. J. 6. That waiver is expansive:

> [I]f and to the extent that applicable law permits a full waiver of claims between landlords and tenants in leases such as this Lease, then Landlord and Tenant waive all claims against the other . . . for any loss, damage or injury, notwithstanding the negligence of either party in causing a loss or the availability of insurance proceeds.

Lease ¶ 4.4. The waiver is preceded by a long discussion of how "Landlord and Tenant . . . acknowledge that the use of insurance is the best way to protect against loss," and an agreement that "in the event of loss or damage . . . such loss" will be satisfied first from insurance proceeds, then from "additional insurance proceeds that would have been paid to the party suffering the loss . . . had the insurance required . . . been carried by such party," and "*finally*, by the third party (provided such third party is not an agent or employee of Tenant) causing the loss or damage." *Id.* (emphasis added). The paragraph never mentions recovery between Landlord and Tenant in a contract suit. In short, the parties intended to waive all contract claims against each other. *Id.*

Ms. McGee makes various attempts to escape this language. None succeed.

---

[2] Even though the Church moved for summary judgment before Ms. McGee's Second Amended Complaint, it is not moot (except for the First Amended Complaint's sixth claim, which she has now dropped). An amended complaint supersedes prior ones. But it only moots pending motions for summary judgment if judgment is sought on claims that the operative complaint no longer contains. *Pinson v. Dep't. of Justice*, 69 F. Supp. 3d 108, 111-12 (D.D.C. 2014) (denying motions for summary judgment as moot when addressed to extinct claims, but granting a motion for summary judgment that addressed a live claim); *see also Daniels v. United States*, 947 F. Supp. 2d 11, 15 (D.D.C. 2013) (denying a motion to dismiss but merely staying a pending motion for summary judgment after the plaintiff filed an amended complaint).

First, she argues that the waiver does not apply to the sewer line, because the entire Lease applies only to the "Premises," a defined term that includes only the "Building . . . the land, and the ground on which the Building sits." Opp. Mot. Summ. J. at 6, ECF No. 30. Assuming for purposes of argument that Ms. McGee is right that the Lease and its waivers exclude the sewer line from the "Premises," her contract claims would *still* fail. The waiver extends to "all claims . . . for any loss, damage or injury" that might arise "in . . . this Lease." Lease ¶ 4.4. Thus, Ms. McGee has waived all lease-based contract claims. All that remains is to figure out which claims are contract claims and dismiss them. It is irrelevant that some waived claims might be factually linked to a something outside the contract, such as a non-leased appurtenance. This argument is a red herring.

Ms. McGee's second argument is that the liability waiver is unenforceable as a matter of public policy. Opp. Mot. Summ. J. 7. She argues that "disclaimers of strict liability are not enforceable," *id*. at 7 n.35 (quoting *Potomac Plaza Terraces v. QSC Prods.*, 868 F. Supp. 346, 355 (D.D.C. 1994)), and claims that the District of Columbia's Child Development Facilities Act—which protects the "health, safety, and welfare of children, infants, [and] toddlers"—is a strict liability statute. Implying that the Church violated this statute by failing to clean up the sewage, Ms. McGee argues that the liability waiver is unenforceable, since it would absolve the Church of liability for a strict liability offense.

This argument has so many holes it is hard to count them. First, the District of Columbia "has long employed an 'objective law' of contracts," under which the plain meaning of the contract language governs "unless there is fraud, duress, or mutual mistake." *Abdelrhman v.*

6

*Ackerman*, 76 A.3d 883, 888 (D.C. 2013). Without fraud, [3] duress, or mutual mistake, the waiver's plain language is fully binding. *See Abdelrhman*, 76 A.3d at 888.[4] Second, the Child Development Facilities Act binds Ms. McGee's conduct as the party licensed to run a child development facility, *not* the Church's conduct as landlord. Reply in Support of Mot. Summ. J. 4-5 (Reply Mot. Summ. J.); *see generally* D.C. Code §§ 7-2031-2051 (requiring a license, and authorizing regulation of licensees). Third, strict liability is a products liability concept from torts. *See, e.g., Payne v. Soft Sheen Prods.*, 486 A.2d 712, 720 (D.C. 1985) ("a plaintiff could recover if he established, first, that the product was defective . . . and second, that as a result of the defect, the product caused injury."). Ms. McGee cites no authority applying the concept in the context of a lease. In sum, Ms. McGee's strict liability argument is not strictly relevant, and the liability waiver stands unrebutted.

Finally, Ms. McGee points out that the District of Columbia law allows waiver of negligent conduct, but not "gross negligence, recklessness, or intentional conduct." Opp. Mot. Summ. J. 10 & n.50 (quoting *Carleton v. Winter*, 901 A.2d 174, 181 (D.C. 2006)). In addition to her gross negligence claim, she tries to finagle her way out of the waiver of *contract* claims by asserting that the Church intentionally failed to clean up the sewage or maintain the sewer line. *Id.* at 10-11. But even if Ms. McGee could show that the Church committed reckless or intentional misconduct, the rule that she cites allows recovery only under those theories in the

---

[3] Ms. McGee's fraudulent misrepresentation claims are legally insufficient because she only alleges that the Church lied *in the Lease* about its willingness to pay for repairs. Am. Compl. ¶ 21. Under District of Columbia law, a fraudulent inducement claim cannot rest on misrepresentations in the contract itself. *Fuentes-Fernandez & Co., PSC v. Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 394 (D.D.C. 2016).

[4] Although there can be no waiver of the implied warranty of habitability in residential leases, *George Wash. Univ. v. Weintraub*, 458 A.2d 43, 47 (D.C. 1983), this is a commercial lease. No such warranty exists in commercial leases. *Pinzon v. A & G Props.*, 874 A.2d 347, 352 (D.C. 2005).

*tort* context. Ms. McGee's own citations make this clear. *Carleton*, 901 A.2d at 181 ("Courts do not enforce agreements to exempt parties *from tort liability* if the liability results from that party's own gross negligence, recklessness, or intentional conduct.") (emphasis added) (internal citation omitted). This rule cannot save Ms. McGee's contract claims.

As the Lease waived all contract claims, the Church is entitled to summary judgment on those four counts: declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. All seek to enforce the Lease and so sound in contract. *See* Am. Compl. ¶¶ 42-62, 69-71.

## B.

There is a silver lining for Ms. McGee, though. Because the parties have waived all contract claims between them, the Court *sua sponte* reconsiders its decision to deny the Plaintiff's Motion to Dismiss the Church's counterclaims. *See Marconi Wireless T. Co. of Am. v. United States*, 320 U.S. 1, 47 (1943) (holding a district "court [does] not lack power at any time prior to entry of its final judgment . . . to reconsider any portion of its decision"); *United States v. Rezaq*, 899 F. Supp. 697, 701 (D.D.C.1995) ("[a] district court always has the power to modify earlier orders in a pending case"); *United States v. Long*, Crim. No. 10-171, 2012 WL 848161 at *1 (D.D.C. Mar. 13, 2012) (granting *sua sponte* reconsideration). The Church's counterclaims are based entirely on the Lease, ECF No. 16-1, and the Lease's waiver is enforceable—as both parties have now argued. Church Mot. Summ. J. at 6-7 ("the terms of the Lease contain an unambiguous, full waiver of any [and] all claims among the parties arising out of the Lease."); McGee Mot. Dismiss Counterclaims, ECF No. 20 at 6 ("the parties mutually agreed to avoid litigation over claims for property damages. . . . Courts in this Circuit have enforced liability

waivers even less specific than [this].")." No contract claims are legally viable under this Lease, so Ms. McGee's Motion to Dismiss will be granted.

## C.

The waiver also extends to negligence claims, Lease ¶ 4.4, and so Ms. McGee tries to avoid waiver with a "gross negligence" claim sounding in tort. Am. Compl. 12. She alleges that the Church was grossly negligent (1) in failing to properly maintain the sewer line through the previously-installed cleanout line and (2) in failing to remediate the sewage damage after it occurred. *Id.* To prevail on an ordinary negligence claim, a "plaintiff bears the burden of proving the applicable standard of care, defendant's deviation from that standard, and a causal relationship between the violation and plaintiff's injuries or damages." *District of Columbia v. Billingsley*, 667 A.2d 837, 841 (D.C. 1995). But to show gross negligence, a plaintiff must show an "extreme departure from the ordinary standard of care." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (citation omitted). Gross negligence is "the failure to exercise even slight care," and "such negligence as would shock fair-minded men." *Id.* (citation omitted). Ms. McGee's allegations do not rise to that level.

Consider another sewer case. In *Billingsley*, the plaintiff's property was flooded by a sewer line three times in a single month. 667 A.2d at 838-39. The first time, three inches of water rose in her basement before District of Columbia employees "broke up the blockage in the sewer line under the street." *Id.* Ten days later, the basement flooded again, this time five or six inches deep in water and sewage. *Id.* at 839. City employees arrived several hours later, but the water had already drained away. *Id.* Eight days later the basement flooded a third time, with water and sewage reaching four feet deep, including dead rodents and diapers. *Id.* The plaintiff sued the city under a negligence theory and received a $40,000 judgment in a jury trial. But the

9

District of Columbia Court of Appeals reversed, finding that the plaintiff "failed to establish a *prima facie* case of negligence against the District." *Id*. at 838. The court reasoned that the doctrine of *res ipsa loquitur* did not apply, as the sewer line was not under the District of Columbia's exclusive control. *Id.* at 841. On the relevant standard of care, the court found that "[t]here is no way of knowing from the evidence whether the District was negligent in correcting the earlier problem or whether subsequent blockages resulted from bricks and gravel being injected again into the sewer by known or unknown individuals after the District corrected the situation" after the first incident. *Id*. at 842.

Here, Ms. McGee's allegations are sparse. And if the evidence in *Billingsly* could not establish mere negligence, Ms. McGee cannot show gross negligence. She says that "numerous" sewer line floods had occurred before, but she does not say how many, or the seriousness of the damage. Am. Compl. ¶ 16. She contends that the Church should have maintained the sewer line, but she does not say what a reasonable landlord would have been doing to ensure proper maintenance. *Id*. And she argues that after the flood occurred, the Church should have restored the Premises, refusing to do so in "reckless[] disregard [for] its legal and contractual obligations." *Id*.

But as the Church points out, claims for negligence must exist independent of contractual duties, Mot. Summ. J. 9-10 (citing *Jia Di Feng v. Lim*, 786 F. Supp. 2d 96, 106 (D.D.C. 2011)), and so any argument based on those alleged duties is no help. Ms. McGee leans heavily on the "public health and safety threats" to the Academy, arguing that the Church's refusal to pay for remediation endangered children, and so would "shock fair-minded men." Opp. 11-12 (citations omitted). But Ms. McGee never alleged that anyone's health was threatened. The Academy immediately ceased operations after the flood and never resumed. Am. Compl. ¶¶ 13-17. These

10

allegations, bare as they are, permit no reasonable inference that the Church departed from the standard of care in such an extreme way that it would shock a fair-minded observer. The Church is therefore entitled to summary judgment on Ms. McGee's gross negligence claim as well.

### III.

Erie Indemnity moves to dismiss the claims against it, arguing that it was not a party to any contract with Ms. McGee. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).[5] To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). A court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but not "assume the truth of legal conclusions." *Id*. "In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d

---

[5] Although Erie Indemnity characterizes its motion as arising under Rule 12(b)(1) for lack of jurisdiction, its core argument is that Ms. McGee has named the wrong insurance entity, making her contract claims legally insufficient. That is not a jurisdictional issue, but a Rule 12(b)(6) issue. *Browning*, 292 F.3d at 242. The Court has diversity jurisdiction over this entire case as currently constituted, since Ms. McGee is a citizen of Maryland, Emergent Preparatory Academy was a citizen of the District of Columbia, and Erie Indemnity is a citizen of Pennsylvania. Am. Compl. 2; 28 U.S.C. § 1332(a)(1).

11

621, 624 (D.C. Cir. 1997). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Erie Indemnity is right: Ms. McGee has named the wrong insurance entity. The insurance policy repeatedly refers to Erie Indemnity as the "attorney-in-fact" for "Erie Insurance Exchange" and its subscribers, not as the insurer. Ultraflex Package Policy (Policy), ECF No. 31-2 at 12 (page numbers created by CM/ECF).

In another case involving Erie Insurance Exchange, a district court explained how reciprocal insurance exchanges work:

> A reciprocal insurance exchange is an unincorporated association of persons or entities, referred to as subscribers, who exchange risks among themselves. The goal of the exchange is for an individual or entity to obtain insurance by entering into a pool of subscribers who all agree to insure one another, subject to certain conditions. Thus, in a reciprocal insurance exchange, each subscriber is *both* an insurer and an insured. . . . The association is not operated for profit, but acts through a person or corporation serving as attorney-in-fact for the organization. Although the powers of the attorney-in-fact may vary from exchange to exchange, the role is largely administrative.

*James G. Davis Const. Corp. v. Erie Ins. Exch.*, 953 F. Supp. 2d 607, 610–11 (D. Md. 2013) (cleaned up).

This background makes the relevant legal relationships—and Ms. McGee's Policy— clear. Erie Indemnity, as attorney-in-fact, conducts the business of Erie Insurance Exchange and its subscribers, and Ms. McGee has agreed to allow Erie Indemnity to play this role:

> Your signing the "Subscriber's Agreement," which includes a limited power-of-attorney, permits Erie Indemnity Company, as Attorney-in-Fact, to make reciprocal insurance contracts between you and other Subscribers and otherwise manage the business of the Erie Insurance Exchange. This power-of-attorney applies only to your insurance business at the Exchange and is limited to the purposes described in the "Subscriber's Agreement."

Policy, ECF No. 31-2 at 12. For "policies issued by *Erie Insurance Exchange,*" Erie Indemnity is allowed to keep 25% of the premium . . . as compensation for . . . acting as Attorney-in-Fact . . . managing the business and affairs of Erie Insurance Exchange . . . and . . . paying general administrative expenses." *Id*. at 14. In simple terms, Erie Insurance Exchange issues the policies, using subscribers' premiums to pay claims and expenses. Erie Indemnity serves as attorney-in-fact for the Exchange and its subscribers. Unfortunately for Ms. McGee, that makes Erie Indemnity a non-party to this contract.

Ms. McGee counters by arguing that Erie Insurance Exchange *cannot* enter into contracts, and so Erie Indemnity must be "the real party in interest." Opp. Mot. Dismiss 11. She cites one of Erie Indemnity's filings with the Securities and Exchange Commission, in which it states:

> By virtue of its legal structure as a reciprocal insurer, the Exchange does not have the ability to enter into contractual relationships and therefore Indemnity serves as the attorney-in-fact on behalf of the Exchange for all claims handling services, investment management services, and certain other common overhead and service department functions in accordance with the subscriber's agreement.

ECF No. 11-1 at 5. Ms. McGee focuses on the phrase "the Exchange does not have the ability to enter into contractual relationships," but the larger context makes clear that the Exchange has only a *practical* inability to enter into contracts, not a *legal* inability. The Exchange is "an unincorporated association of . . . subscribers, who exchange risks among themselves." *James G. Davis Const. Corp.*, 953 F. Supp. 2d at 610. Without a corporate structure or employees, the entity has nobody to put pen to paper. That is the role played by Erie Indemnity. The SEC filing goes on to say:

> Our [Erie Indemnity's] primary purpose is to manage the affairs at the Exchange for the benefit of the policyholders. The Exchange is our sole customer and our earnings are largely generated from

13

> management fees based on the direct and assumed premiums written by the Exchange. We have no direct competition in providing these services to the Exchange.
>
> The Exchange generates revenue by insuring preferred and standard risks . . . .

ECF No. 11-1 at 5.

Ms. McGee's next argument is based on the Policy. She highlights the fact that the contract includes "a limited power-of-attorney among the Subscribers and the Erie Indemnity Company, as Attorney-in-Fact," and infers that this makes Erie Indemnity a party to the contract. Opp. 10 (citation omitted). That may be true in the barest and most technical sense: Erie Indemnity has contracted to become attorney-in-fact for all the Exchange's subscribers. But Ms. McGee has won the battle and lost the war. She is suing Erie Indemnity Company to enforce the Policy, in search of insurance payments that only the *insurer* can be liable for. Erie Indemnity is not her insurer.[6] Most of the Policy—including the portions that impose insurance liability—is a contract between Erie Insurance Exchange and Ms. McGee, not Erie Indemnity.[7] Because Erie

---

[6] Although Ms. McGee points out that Erie Indemnity must settle claims on behalf of the Exchange, Opp. 11, that still does not make Erie Indemnity her insurer. Insured parties cannot sue their insurer's attorney to enforce the insurer's obligations.

[7] Ms. McGee also argues that the lack of a signed version of her subscriber agreement creates "several problems." Opp. 12. But "[i]t is established law that a signature is not always necessary to create a binding agreement." *Presidential Motor Yacht Corp. v. President Marine, Ltd.*, 753 F. Supp. 7, 13 (D.D.C. 1990). Rather, "[t]he purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown by the conduct of the parties." *Id.* (citation omitted). Here, both the Plaintiff and the Defendant agree that Ms. McGee was in fact insured, and both parties have shown through conduct their mutual assent to be bound. *See*, *e.g.* Affidavit of Ellen Lipiec, ECF No. 31-1 ("At all relevant times, Erie Insurance Exchange provided coverage to Plaintiff."). Although the parties disagree about how to interpret the contract, Ms. McGee uses the same document as Erie Indemnity for her claims. Opp. 13 ("McGee contends Indemnity is the contracting party based on the definitions in its own form agreement."). If anything, the lack of a signed insurance agreement is more problematic for a plaintiff who wants to *collect* on such an agreement than for a defendant that wants to avoid liability.

Indemnity is not Ms. McGee's insurer under the Policy, her claims against it are legally insufficient.

## IV.

For these reasons, the Court will grant the Church's Motion for Summary Judgment, Erie Indemnity's Motion to Dismiss, and Ms. McGee's Motion to Dismiss the Church's counterclaims. A separate order will issue.

Dated: September 28, 2018                           TREVOR N. MCFADDEN, U.S.D.J.